UNION DEVELOPMENT & CONSTRUCTION CO., Limited, et al. v. GLOBE ASPHALT CO.

(Circuit Court of Appeals, Fifth Circuit. October 4, 1909.)

No. 1,774.

SALES (§ 77*)—CONTRACT—CONSTRUCTION—COMPENSATION—CONTRACT TO FURNISH ASPHALT REQUIRED BY PAVING CONTRACTS.

By a contract made by an extended correspondence an asphalt company agreed to furnish to a paving company crude asphalt from its mine and liquid flux necessary to make an asphaltic paving cement, sufficient in quantity to complete certain contracts of the paving company with the city of New Orleans, at the price of $37 per ton, with a guaranty that each ton of the cement would lay 90 square yards of pavement specified. The cement was to be made in New Orleans by means of a portable plant furnished by the asphalt company, which was also to furnish a man to have full charge of the making and laying of the same, his salary to be paid by the paving company. Held that, construing the contract in the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

light of all the correspondence, it required the paving company to pay for the asphalt at the rate of $37 for each 90 square yards of pavement laid, and not for each ton of the crude material shipped.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 77.*

Contracts for sale of things to be produced or manufactured, see note to Star Brewery Co. v. Horst, 58 C. C. A. 363.]

Appeal from Circuit Court of the United States for the Eastern District of Louisiana.

Suit in equity by the Globe Asphalt Company against the Union Development & Construction Company, Limited, and others. Decree for complainant, and defendants appeal. Reversed in part.

J. D. Rouse, Wm. Grant, Wm. B. Grant, Harry H. Hall, J. Blanc Monroe, Emile Godchaux, Samuel L. Gilmore, and H. G. Dupre, for appellants.

John Clogg, Lamar C. Quintero, and Edgar H. Farrar, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. The Union Development & Construction Company, Limited, one of the appellants, which we will call the Union Company, is a corporation engaged in the paving business in the city of New Orleans. The appellee, the Globe Asphalt Company, which we will call the Globe Company, was the lessee, for a long term, of extensive and rich natural deposits of asphalt on Moore's Ranch, Goleta, Cal., the Goleta mines, and refined the product of these mines at a refinery which it installed and operated at a point in California which it called Obispo, and from which it marketed these products throughout the United States under the name of "Obispo asphalt." On November 14, 1901, the appellee granted to the Globe Asphalt & Paving Company, of South Dakota, the exclusive right to use Obispo asphalt in the states of Florida, Louisiana, Mississippi, and Texas. This Paving Company agreed to take certain minimum amounts for each state every year during the life of the contract, which was to run 25 years. Shipments under the contract had to begin in January, 1903, and continue at the rate of 50 tons a month. The failure of the Paving Company to take the minimum amount authorized cancellation. The Paving Company agreed to use no other asphalt, and was to pay $30 per ton of 2,000 pounds, gross weight, f. o. b. cars or boat at Obispo, Cal. On October 20, 1902, this contract, with all rights and benefits thereunder, was transferred to Harold W. Newman, of New Orleans, and on October 27th, of the same year the transfer was duly ratified in writing by the Globe Company, and the price reduced to $25 per ton. Newman subsequently associated himself with other parties, forming the Union Company, which company, with the consent of the appellee did, on November 29, 1902, take over his contract. This contract expired on June 1, 1903, but was renewed by the Globe Company on June 12, 1903, and its privileges and benefits extended to the Union Company, and to any reorganization thereof or formation of a new company as successor.

In April and May, 1903, the city of New Orleans advertised for bids on several large paving contracts. After correspondence and per-

sonal conferences with the appellee, and obtaining full information from its president and certain satisfactory concessions, the Union Company prepared estimates based on Obispo asphalt to be furnished by the Globe Company, and on June 1, 1903, submitted bids on three pieces of paving on which bids were solicited, namely, on Canal street, on Polymnia street, and on Pelican avenue. There were bids by other parties. The bids of the Union Company were the lowest. To these bids objection was made by a member of the council because of suggestions from certain owners of abutting property on Canal street to the effect that the Globe Company was manufacturing a portion of its asphalt from the residuum of petroleum or other oils, instead of exclusively refining asphalt mined from natural deposits. One of the specifications in the city's proposals for bids was that asphalt shall be mined from some natural deposit; that asphalt manufactured solely from petroleum or other oil residuums, shall not be employed. Ultimate action on the Union Company's bid was postponed, and the city council took steps to have the city chemist, who was then in California, visit the appellee's Goleta mines and its Obispo refinery and make report thereon. The result of this proceeding sufficiently appears from the following extracts from letters of the appellee, addressed to the Union Company from Los Angeles, Cal.; the first bearing date of July 21, 1903, in which it was said:

"For reasons not necessary to be explained here, we were compelled to deny Prof. Metz the privilege of officially visiting the Goleta asphalt mine, and, as that was part of his investigation, he deemed it best to stop all investigations. It is doubtful that, even though he had finished up his work, the report that he would have made, though of the most favorable character, would have relieved us of any suspicion that the material to be furnished your company at a later day would not be all, or in part, asphalt made from crude oil. In order that all suspicion may be eliminated, we hereby propose to furnish your company with all the asphalt you may want for use in street paving in New Orleans, La., direct from the Goleta asphalt mine, and to furnish with each shipment thereof the Goleta wharfmaster's shipping receipt and weight sheets, so there may be no question as to where the asphalt comes from, and this asphalt can then be refined at your New Orleans asphalt paving plant, immediately under the eye of such city official as may be appointed for that purpose. This Goleta asphalt, as it comes from the mine, is much richer in bitumen than the refined Trinidad, and contains no water; hence you can refine and then flux it with the liquid asphalt we would furnish you from our Obispo works, and have exactly the same results and product as we obtain at our works in the shape of our finished refined Obispo asphalt. By handling the matter in this way, the question of crude oil asphalt cannot be used in any manner. * * * As this Goleta asphalt will average 60 per cent. or better of bitumen, as against 95 to 97 per cent. that is contained in our refined Obispo, we will make something like a corresponding difference in price. In other words, we will make the price for the Goleta asphalt at $15 on board steamer at the mine, or $18 per ton f. o. b. cars East San Pedro Harbor. We trust that the proposition will remove all objections to awarding your company the paving contracts, and should suggest that this proposal as to the shipment of your supply of asphalt direct from the Goleta mine, and the refining thereof in New Orleans, be written out and formally presented to the finance committee for their consideration."

And again the next day it wrote:

"If the question of the awarding of the contracts to the Union Development & Construction Company is not dependent upon strictly political grounds, we cannot see how the city authorities can do otherwise than give this company

the work, since we have made a proposition by which the city is sure of their supply of asphalt direct from the mine, and such evidence connected therewith as to make it absolutely sure that their assignments can be traced from the Goleta mine direct to New Orleans. Upon arrival in New Orleans, this asphalt can be refined just as well at the ground, wherever your asphalt plant is located, and a refined product obtained that would be of the same high grade and quality as though it was refined in the modern asphalt refinery of this coast. If this programme is carried out, the writer [the president of the Globe Company] will personally look after the proper appliances that will have to be erected for this refining process."

And on July 27, 1903, its president wired the Union Company:

"We will guarantee cost and freight will not be more than $42 per ton for finished refined asphalt on final and true delivery your works at New Orleans; that is, according to contract, regardless of cost to us. I will pay for refining plant and cost for refining, and will guarantee delivery to you asphalt equal in quality and purity as though refined here."

This proposition was refused by wire. By letter of the same date the Globe Company expressed itself thus:

"It is intended that the refined Obispo asphalt shall be delivered to you at a cost price fixed by the contract existing between the Globe Asphalt Company and the Union Development & Construction Company; the only difference being that the refining will be done in your city, instead of California. The whole object of this plan has been given in a former letter; that is, to eliminate the crude oil asphalt question, and, as the finished material will not cost your company any more per ton than as provided for in the contract between us, we cannot see why you would have any serious objections, and surely the city officials will agree that the refining can be done in your city just as well as though done in California."

Upon receipt of this letter, the Union Company replied by wire:

"Your telegram to hand of July 27th. The proposal is accepted. Erect refinery and refine crude here. Expense to be paid by you. Only on condition that you guarantee price of $25 and freight, $12, total $37, per ton of refined asphalt, in accordance with contract dated Los Angeles, October 27th last, since renewed."

To this the Globe Company replied by telegram, dated Los Angeles, July 28th, "We agree to $37 as per your telegram of to-day," which it confirmed by letter of same date, in which it said:

"Your company is not expected to participate in any expense necessary for refining in New Orleans. We stand ready to supply you with refined Obispo asphalt made from Goleta crude asphalt, either from New Orleans plant or Obispo, at your option, and which will comply with all terms of your contract. This proposition is made to eliminate the crude oil asphalt question."

The next day the Globe Company wrote:

"In answer to your telegram of the 28th we wired you as follows: 'We agree to $37 as per your telegram of to-day'—meaning by this that the price of the refined Obispo asphalt which we expect to refine in New Orleans and will be turned over to your company at the price of $37 per ton for the refined material."

This agreement to refine the asphalt in New Orleans was satisfactory to the city authorities, and on October 1, 1903, the necessary ordinances accepting the bids of the Union Company were passed by the city council. By this time a panic had so far congested the money markets that the Union Company found itself unable to finance the large

paving contracts which it had undertaken. Its duly authorized representatives brought this phase of the situation to the notice of the Globe Company. That company at once displayed active anxiety to get its asphalt introduced into New Orleans, and its president undertook personally to interest Northern capitalists in the matter and have them take over the paving contracts held by the Union Company. He sent the Union Company this dispatch:

"Pittsburg, Pa., Oct. 3, '03.

"Flinn will decide 6th day of October. The prospects are encouraging. If Flinn decides favorably, a special agent will be sent immediately to New Orleans, if the city can extend the time that it is necessary to take so an agent can send copy of report. Have received a telegram announcing Guild quite impossible at present."

And on the same day he wrote the Union Company as follows:

"I submitted the telegram to Booth & Flinn to-day, and, after explaining matters fully, Mr. Geo. Flinn expressed himself in a way that left no doubt that he was deeply interested, and that their firm was at liberty to take over the contracts. He requested that I leave the papers with him to look over, and that I call at his office next Tuesday at 9:30 a. m. Mr. Flinn expressed himself in a very frank manner, stating that he looked upon the matter in a very favorable light; that the only difficulty that might arise would be to arrange for such a large sum of money under the present conditions of the money market. If this firm comes to a favorable conclusion, it will be necessary to at once send a representative to New Orleans to corroborate all that I have said, and at the same time close the deal; but, before sending this 'agent, assurance of a reasonable time extension must be guaranteed by the New Orleans city officials. You can arrange this time extension business, advise me of the fact, and I can inform B. & F., and no doubt I will go to your city with their agent. The inclosed telegram from Guild & Co. was received late this afternoon: 'We have taken up the matter with T. B. Redmond. Information of any kind will be promptly forwarded as fast as obtained.' "

On October 6, 1903, the Union Company telegraphed Mr. Dubbs:

"We have obtained extension until 19th day of October only on condition that if you guarantee Flinn is serious and will arrive not later than 12th day of October."

To which Dubbs replied:

"Pittsburg, Pa., Oct. 8, '03.

"Your telegram to hand during my absence. Under favorable conditions at present existing, I am satisfied we can accomplish desired result within ten days. We have written full particulars."

On October 8, 1903, the Union Company wrote to Mr. Dubbs:

"Your favor of the 6th inst., confirming your telegram of same date, to hand. We understand that thereby Mr. Flinn intends to leave Pittsburg for this city on Saturday, and if not able to leave on that date he will do so on a later day, provided necessary time is given by the city. As wired you, we are granted time by the city notary to sign up the contracts until October 19th; but, should we be forced to ask for further delay, we must do so through the council, and thereby expose our weakness to the public and injure our credit. It is therefore important that you use every endeavor to get Mr. Flinn on the way by Saturday. This would give him a full week to decide. After he has declared his decision to take hold of these contracts, we can then easily obtain further extension from the council in his behalf without injury to ourselves. * * * Please wire us Saturday as to Mr. Flinn's positive movements, as our friends here want to know that we are serious in our representations to them. We, on our part, will wire you on Saturday morning that the extension granted us still holds good until October 19th."

Mr. A. Ledoux, president of the Union Company, invested with plenary power to represent it with reference to these paving contracts, and Judge John Clegg, a member of its executive committee and acting as such, and in part, also, as its legal adviser, visited Mr. Dubbs at Pittsburg. He (Mr. Dubbs) was president of the Globe Company and invested with plenary power to represent it in all matters touching these contracts. Referring to this visit, Judge Clegg in his testimony says:

"We went from here [New Orleans] to Pittsburg, and Mr. Dubbs thought he had parties there who would take the contract, and, not succeeding there, he joined Mr. Ledoux and myself in the visit to New York, seeking to interest people there. Being well informed of the situation, he went there, and was very much in earnest in seeking to get the Brooklyn people to take it up."

On October 10, 1903, Mr. Dubbs wired the Union Company from Brooklyn, N. Y.:

"I have finally made a deal, and will be in New Orleans Thursday."

On October 12th, he wired from Brooklyn:

"Have made deal with New York parties, and will arrive in New Orleans next Thursday with party. Wire me, care Astor House, if satisfactory."

On October 13th, from Pittsburg, Pa., Mr. Dubbs wrote the Union Company:

"Have just returned from New York City, where I went first to see Mr. Kelly, of the Brooklyn Alcatraz Asphalt Paving Co., who had suggested to Mr. Williams that he would like to take over the New Orleans contracts, but, after going over the matter, decided that it would take more money than he commanded. I then took it up with Mr. Firmen, a contractor of New York, who stated on Sunday positively that he would take over the business, and on Monday we were to draw up a preliminary contract, and then start for your city on Tuesday night. On the strength of this I wired you that I would close the deal. On Monday, when we got together, Mr. Firmen stated that he would be unable to finance the business unless the temporary certificates could be used as collateral in your New Orleans banks; hence my message from New York on this subject, and my telegram of to-day from this city on the same question. If your answer is in the affirmative, I am to wire Mr. F., and he will at once start for New Orleans to close up the deal. He expressed himself as only being able to raise $100,000 at the present time, and he would have to depend on the use of the certificates for raising the balance of the money needed to carry out the work. We are awaiting your reply, and, if favorable, you can expect us in your city, not later than Friday morning. H. H. Flinn dropped the matter at the last moment, owing to the fact that he could not leave the city, and would not trust the matter to any one else. Firmen has arranged for two portable asphalt plants, steam rollers, etc., and claims that he can finish up the work in less than six months."

On October 15, 1903, Mr. Dubbs wired the Union Company from Pittsburg, Pa.:

"George Firmen requests us to telegraph you as follows: 'I cannot contract immediately for New Orleans work. Agnew will leave for your place to-night.'"

To which the Union Company replied:

"Your telegram to hand. Under the circumstances, have no occasion for Agnew's coming, unless expenses to be paid by you."

On October 16, 1903, Mr. Dubbs wrote the Union Company from Pittsburg, Pa.:

"As wired you, Mr. Agnew started last night for your city. He will explain more fully as to the tight condition of the money market, and for that reason, more than anything else, it is impossible to handle the New Orleans contracts just at this time. If you can by any means get the city officials to grant you more time, and if the money market should ease up within a reasonable time, there will be no trouble in floating the business on the lines as desired by you. Mr. Agnew will have some suggestions to make which might be of interest to you, and if you should decide to act on any of them you can count on every assistance that this company can give. We will be at all the expense of Agnew's trip, and, should he need any funds before he gets through in your city, kindly advance same, and draw on us at this office, and we will hon---- same. We trust that something will result from Agnew's vi- " "

Touching this letter the counsel for the appellee says in his printed brief:

"The Union Company was informed by a letter of date October 16th that all attempts to get somebody to take over these contracts with the city had failed. Thereupon a syndicate was formed, composed of Samuel Hyman, who had been a member of the executive committee of the Union Company, Alfred Hiller, and Charles Godchaux."

Samuel Hyman, above referred to, who was a shareholder in the Union Company and fully conversant with all the correspondence by letter and wire which that company had had with the Globe Company or with its president, Mr. Dubbs, on the subject of Obispo asphalt and the Union Company's contracts with the city of New Orleans, testifies that the Union Company could not go on with these contracts; that he had tried to raise money for them in every shape and form; that Judge Clegg had done so, and Mr. Ledoux, and he thinks that between them they had tried every contractor in the United States, to get them to take over the contracts, but did not succeed.

Alred Hiller, above named, is a brother-in-law of Samuel Hyman, and became much interested in the difficulty in which Hyman was involved with the Union Company, and made diligent inquiry into the condition of its affairs, and took into consideration the proposition which Hyman made to him in regard to forming a syndicate in which he and Hyman and others who might be induced to take part would unite and take over the contracts which the Union Company had obtained from the city. It was expected that F. B. Hull, a stockholder in the Union Company, and Charles Godchaux, and perhaps others, would unite with Hyman and Hiller in forming the syndicate; but Hull concluded to confine his operations entirely to the building department of the Union Company, and Mr. Charles Godchaux alone united with the other two. But, before he consented to come in, he pressed the question upon the others, "How much is that asphalt going to cost?" Being told, he asked, further, "Are you sure of it?" And, being assured, he pressed the further question, "How much will it lay?"

Mr. Hyman, examined as a witness, testifies:

"Then Mr. Dubbs came down, and he and his man, Agnew, and Mr. Ledoux and myself (Hyman) were all up in the Union Development & Construction Company's office one night, and Mr. Dubbs gave us figures on the whole thing, and Mr. Ledoux put them down, and it was understood just as plain as a man

can talk that they figured out how much asphalt it was going to take and the prices."

Mr. Hiller testifies that, when Mr. Hyman requested him to go into the syndicate, he stated the cost of the asphalt from which a large portion of the profit on the work was to come, and requested that Hiller, in order to familiarize himself with the statements, should go over the figures which were in the hands of Mr. Ledoux and could be seen at the office of the Union Company. They (Hyman and Hiller) went to the office of the Union Company, and there met Mr. Ledoux and Mr. Dubbs, and Mr. Ledoux, in the presence of Mr. Dubbs, gave Hiller certain papers (shown witness while he was testifying) which showed the cost of the asphalt, touching which the witness says:

"I went over these papers and calculations with Mr. Dubbs and Mr. Ledoux. These figures are in the handwriting of Mr. Ledoux. They were called out by Mr. Dubbs, and Mr. Ledoux wrote them down. They were being gone over with Mr. Ledoux and Mr. Dubbs when I stepped into the office. They were then already written. Upon the basis of these figures, which practically verified the statements made by Mr. Hyman, I proceeded to form the syndicate."

At the request of Mr. Godchaux that Mr. Dubbs should confirm the price made to the Union Company for asphalt to the syndicate, Mr. Hiller requested Mr. Dubbs to address the parties a letter to that effect, in compliance with which request Mr. Dubbs thereafter handed Mr. Hiller the following typewritten letter (with some carbon copies thereof):

"The Globe Asphalt Company hereby agrees to furnish the Union Development & Construction Company, Limited, and their guarantors, all the Obispo asphalt, in the shape and form of Goleta crude asphalt and refined liquid Obispo flux, both in such proportions as may be necessary to make an acceptable asphaltic cement and in sufficient quantity to complete and finish all of the asphalt paving work that your company now has to do in the city of New Orleans, amounting approximately to 130,000 to 140,000 square yards of asphalt surface street work, the price for same to be $37 per ton of 2,000 pounds gross weight, all f. o. b. cars in New Orleans. This price of $37 per gross ton to be the basic price on our guarantee that each net ton of 2,000 pounds of the refined Goleta and Obispo asphaltic cement will lay an average of 90 square yards of finished asphalt pavement, consisting of a 1-inch binder course and a 1½-inch top or wearing surface; it being understood that in pavements consisting of a 2-inch top coat and 1½-inch binder course the asphalt cement is to lay a proportionate number of square yards of pavement, or 67.5 yards to the net ton of asphaltic cement. The Globe Asphalt Company further agrees to ship forward to New Orleans the asphalt and asphaltic flux as rapidly as the same may be needed for use in the work under consideration. Your company or guarantors to advance and pay all freight and switching charges on same. The Globe Company also hereby agrees to ship upon your order, and same is to arrive in time for use, a complete portable asphalt paving plant and one or two asphalt rollers, for which your company or guarantors is to pay the Globe Asphalt Company for use of same as follows: Five cents per square yard of finished asphalt street surface for the asphalt plant and $5 per working day for each roller. Your company is also to pay the freight charges both coming and going on the asphalt paving plant and on the one or two rollers. The terms of payment and guaranty on said payment to Globe Asphalt Company for all the asphalt furnished and the 5 cents per yard for use of the asphalt plant and the $5 per day each, as rental for the steam roller or rollers, to be as follows: A written guaranty satisfactory to the Globe Asphalt Company is to be given to the Globe Asphalt Company, properly signed by acceptable parties that all money due for said asphalt, asphalt plant, and asphalt roller or rollers shall and will be paid in cash, or equiva-

lent, to the Globe Asphalt Company when the asphalt street work has been finished, the said money to be paid to said Globe Asphalt Company by your company or by the parties signing the guaranty contract referred to, said payment to be paid within 10 days after the said asphalt work is completed and accepted by the city of New Orleans. It is understood that the asphalt furnished by the Globe Asphalt Company and that the asphalt street work done shall be (per se) acceptable and satisfactory to the city of New Orleans. It being understood that all the manipulations of the asphalt, both at the asphalt plant and in laying of same on the street or streets, shall be under the immediate supervision and control of the Globe Asphalt Company, through an agent or representative that said Globe Asphalt Company shall furnish. The salary and expenses of said Globe Asphalt Company agent, manager, or representative shall be at the rate of $2,500 per year, payable by your company as guarantors monthly, and your company to also pay said agent necessary traveling expenses in coming to New Orleans and returning. The asphalt paving plant is to have an engineer accompanying same, and who is to be the responsible agent for the proper care of same; his wages and necessary traveling expenses to be also paid monthly by your company or guarantors. It is further understood and agreed that the Globe Asphalt Company is to attach to each bill of lading on every asphalt shipment a certificate giving the amount of asphalt and the value thereof of such shipment, and said certificate is to be signed by a proper person, acting as agent of the Union Development & Construction Company, Limited, or their guarantors. All asphalt is to be consigned to the Globe Asphalt Company with the B/L properly indorsed for delivery of the asphalt to the Union Development & Construction Company, Limited, or their guarantors, said B/L to be sent through a New Orleans bank and surrendered by said bank upon receiving the signature to the attached certificate above mentioned of the authorized agent of the Union Development & Construction Company, Limited, or their guarantors. This proposition is made with the understanding that all work on the concrete and other parts of the contract will be pushed with all the due diligence necessary to avoid unnecessary delay in the prosecution of the asphalt street work. Acceptance or rejection of this proposition to be made in writing by the Union Development & Construction Company, Limited, and their guarantors within 20 days from date hereof."

The board of directors of the Union Company passed certain resolutions, which were approved at a stockholders' meeting held on November 12, 1903, to the effect that the Union Company transfers, sets over, and assigns, with full substitution, to the syndicate, all of its right, title, interest, claim, and demands, of any nature whatsoever in and to the three paving contracts or bids hereinbefore referred to; the syndicate agreeing to provide all funds for labor, material, superintendence, etc., that may be necessary for the full carrying out of the said contracts, etc. Thereafter the following letters were delivered by the Union Company and its guarantors to the Globe Company:

"Alfred Hiller Company, Limited.

"New Orleans, November 19, 1903.
"Mr. L. A. Dubbs, President Globe Asphalt Company, No. 405 Blakewell Building, Pittsburg, Pa.—Dear Sir: As you have been advised through telegrams from Mr. A. Ledoux, president of the Union Development & Construction Company, Limited, that all matters pertaining to the three contracts with the city of New Orleans which were awarded to the Union Development & Construction Company, Limited, have been arranged, we now beg to advise that your agreement of date October 31, 1903, addressed to the Union Development & Construction Company, Limited, and their guarantors, is accepted, with the exception as follows: It is to be understood that the rental of two rollers is $5 per day for the two, not $5 each. The payment of the crude asphalt and flux is to be made when the work is completed and accepted by the city of New Orleans, and, further, that you are to furnish as-

phalt and flux at the same price for such a quantity as may be necessary during the maintenance feature of the contract. By this is meant what asphalt and flux may be needed to maintain the street for a period of five years. Whilst this last feature may be practically covered by your agreement to the Union Development & Construction Company, Limited, the guarantors or syndicate desire this to be a special understanding with you, your company, as to its supplies for maintenance. We shall advise you in due course concerning the shipments of asphalt, also plant and rollers, and we now beg to inclose to you herewith agreement as was understood would be sent to you.

"Yours truly, [Signed] Union Development & Construction Co., Ltd.,
"A. Ledoux, Pres.
"Alfred Hiller.
"Sam. Hyman.
"Charles Godchaux."

"Alfred Hiller Company, Limited.

"New Orleans, November 19, 1903.

"Mr. J. A. Dubbs, Pres. Globe Asphalt Co., No. 405 Blakewell Building, Pittsburg, Pa.: Referring to your proposal and agreement of date October 31, 1903, we hereby guarantee the payment of all crude asphalt and refined liquid Obispo flux as may be shipped to the Union Development & Construction Company, Limited, for asphalting the following streets in New Orleans, namely: Canal street, from Liberty to Metairie Road; Polymnia, Coliseum to Carondelet; and Pelican avenue, from Bouny street to Elmira street. Also, for rental of asphalt plant and two rollers for said above-described streets. Payments to be made in accordance with terms expressed in said agreement of October 31st, as amended by letter of acceptance of November 19, 1903.

"Union Development & Construction Company, Limited,
"A. Ledoux, Pres.
"Guarantors:
"Sam. Hyman.
"Alfred Hiller.
"Charles Godchaux."

In the resolution of transfer from the Union Company to the syndicate, it was provided that during the operation of the paving contracts with the city this company (the Union Company) shall open and keep a separate set of books, wherein shall be entered exclusively all transactions pertaining to said paving contracts, which books shall be at all times open to the reasonable inspection of the syndicate, the members thereof, or their assigns. It was also provided that in consideration of the Union Company's furnishing, during the operation of the contracts, the use free to the syndicate of its office, office force, office material, officers, and employés, the syndicate shall pay to the company $——— per month, payable monthly, to be continued until said paving contracts have been completed. Books were opened and proper accounts of the proceedings were kept in the office of the Union Company, by or under the direction of Mr. Ledoux, the president of the Union Company, who acted also as the agent or representative of the paving syndicate. Mr. Ledoux died ——— day of ———, 190—. Up to the time of his death he had full control in the office of the operations of the Union Company and of the work of the syndicate, except as to the refining of the asphalt and laying of pavements, which was entirely subject to the direction of Mr. Agnew, who was an employé of the Union Company and its guarantors, and whose salary was paid by them, but who was also agent of the Globe Company especially and completely charged with the refining of the asphalt and the construction

of the pavement so as to make it meet the requirements of the city's contracts. Mr. Dubbs testifies that:

"Mr. Agnew was the general manager of the asphalt department for the guarantors of the Union Development & Construction Company. He was employed on my recommendation. I guaranteed the asphalt would be used in a proper manner, and a pavement laid that would be acceptable to the city; and, so far as the manipulating and handling of the asphalt was concerned, Mr. Agnew was under my instructions. In other words, if I should want to, I could change the form, or I could change the percentage in the pavement. Beyond that, he was not under my control in any way."

The witness Mendlesohn, whose duty it was to follow up the work, write up the books of the syndicate, and add up these books for Mr. Ledoux, testifies that:

"Mr. Agnew had absolute control of the plant. We did not interfere with him. Whatever he did he was responsible for. Mr. Ledoux, the president of the Union Company, was recognized as the head of the whole business. I would not attempt to do anything without consulting with Mr. Ledoux; but there was one party there with whom he (Mr. Ledoux) would not interfere, or to whom he would not give any instructions. That was Mr. Agnew. Mr. Ledoux gave him no instructions as to the refining of the asphalt, or as to laying it, because the Globe Company undertook to furnish asphalt that would make a good pavement, and that it should be properly laid, and that was what Mr. Agnew's business was."

When the shipments of the Goleta crude asphalt and the refined liquid Obispo flux began to arrive, the Union Company and its guarantors noted a material discrepancy between the weight sheets attached to the Goleta wharfmaster's shipping receipt and the weight sheets attached to the carrier's bill of lading, on which the carrier's charges were demanded; and by letter dated January 6, 1904, this matter was brought to the attention of the Globe Company, to which the president of that company replied, on January 9, 1904, as follows:

"Yours of the 6th inst., inclosing paid freight bills, received. We note that the railroad weights differ from the wharfinger's weights; but, as the final settlement between your company and ours is to be based on the number of square yards of finished pavement laid per ton, we need pay no attention to this difference, except to call the wharfinger's attention to the matter, which we have already done."

On July 16, 1904, the paving to be done on Polymnia street had been completed, and the Union Company reported the same by letter of that date, addressed to the president of the Globe Company at its home office in Pittsburg, in which it says, in the first paragraph of the letter:

"We herewith inclose you credit mem. for $1,634.29, for proceeds of asphalt used on Polymnia street, as per your guaranty of 90 yards of finished pavement to the ton."

The body of the memorandum inclosed was in these words and figures:

"N. O., July 1/04.
For 44.17 tons of asphalt, $37.00.......................................... $1,634.29
"Laid on Polymnia street, 3,975.38 sqr. yds. (official measurement) at 90 yards per ton, equal 44.17 tons."

In subsequent statements rendered to the Globe Company of expenditures made and the amount of asphalt used, the asphalt was

credited to the Globe Company on the basis of one ton for every 90 square yards of pavement laid, or of one ton for every 67½ yards of pavement laid, according to the thickness of the course constituting the pavement, respectively, and credited at the rate of $37 per ton so found. These statements so rendered by mail were duly received and retained, without notice of approval or objection being given by the Globe Company. The work was finally completed and accepted by the city, and, on April 10, 1905, the Globe Company served upon the Union Company and each of its guarantors a sworn statement purporting to show a balance in favor of the Globe Company of $56,176.18. The account of the Union Company, made up to April 15, 1905, showed a balance against the Globe Company of $707.90. Outside of several minor disputed charges, the whole discrepancy in these accounts arose from the difference in the interpretation of the contract by the two respective parties. The Globe Company based its statement on the theory that the Union Company was to pay for the crude Goleta asphalt at the rate of $37 per ton for that material, and for the refined liquid Obispo flux at the rate of $37 per ton for that material. There was a loss of over 40 per cent. in changing the Goleta crude asphalt, as the same was done in the Globe Company's refinery at New Orleans, into asphaltic cement that was used in paving the streets. This loss made the difference, substantially, of the $56,176.18 between the price claimed by the Globe Company and that contended for by the Union Company. The Union Company, rejecting the interpretation contended for by the Globe Company, refused payment of this account rendered. Thereupon the Globe Company entered its suit at law against the Union Company and its guarantors for the amount claimed. On motion of the defendants, not resisted by the plaintiffs, the Circuit Court ordered the pleadings to be reformed according to the practice in courts of equity, and in compliance therewith in due course the proper pleadings were filed. Thereupon the Circuit Court, of its own motion, ordered the case to be referred to a special master, with direction and authority to report on all questions of fact and law therein, his report to be merely advisory to the court.

The pleadings are extended and somewhat confusing, and the result of the pleadings and of the findings of the master and the substantial admissions of the parties bring the cause to a single issue, which is: Must the defendants pay for crude Goleta asphalt and for the refined Obispo flux, each, $37 per gross ton f. o. b. New Orleans, or must they pay for asphaltic cement net to them on the basis of the number of square yards of pavement laid. The special master duly reported, after full hearing, his findings of fact, resulting in the ultimate conclusion that the statement of the defendants, showing a balance of $707.90 due them by complainant, is correct, with the following exceptions (noting the exceptions), which change the balance from $707.90 against complainants to the sum of $1,074.12 in favor of the complainants. There were very numerous exceptions to the findings of the master, and at the hearing the Circuit Court sustained these exceptions and passed its decree in favor of the complainants. Due exceptions were reserved to this action of the court and are presented to us by the assignment of errors.

We are clear in our conviction that the Circuit Court·erred· in passing its decree for the complainants. The complainants insisted below, and now urge, that the letter of October .31, 1903, addressed to the Union Development & Construction Company, Limited, and their guarantors, and signed "The Globe Asphalt Company, J. A. Dubbs, President," and the letter of acceptance of November 19, 1903, addressed to Mr. J. A. Dubbs, President Globe Asphalt Company, and signed, "Union Development & Construction Company, Limited, A. Ledoux, President," "Alfred Hiller," "Sam. Hyman," and "Charles Godchaux," and the letter of guaranty of same date signed by the same parties, constitute a new, separate, unambiguous written contract, susceptible of no other construction than that which complainants put upon it. Without rehearsing the master's arguments, we concur with him in concluding that the contract claimed to be evidenced by the letters to which we have just referred is not plain and unambiguous, and that all competent evidence tending to throw light on what was the real intent of the parties should be considered. It is clear that from July 27 to October 31, 1903, the contract was that the Globe Company would sell to the Union Company Obispo' asphalt at the price of $37 per ton, which would lay 90 square yards of pavement to the ton of 2,000 pounds, finished asphalt pavement, consisting of 1-inch binder course and a 1½-inch top or wearing surface; it being understood that in pavements consisting of 2-inch top coat and a 1½-inch binder course, the asphalt cement is to lay a proportionate number of square yards of pavement, or 67.5 yards to the net ton of asphaltic cement. From a consideration of all the proof, we conclude, with the master, that this feature of the contract was not changed by the writings of October 31st and November 19th, and that the account rendered by the Union Company on the basis of this construction of the contract was the correct account as to that item, and that the correction made by the master of some of the smaller details of debits and credits, showing a balance in favor of the complainant of $1,074.12, is correct, and should have been made the basis of the decree.

The decree is, therefore, in the largest part reversed, and is here so amended as to be rendered in favor of the appellee for the sum of $1.074.12, with legal interest from the date of the filing of complainant's bill, and that the costs in both courts be adjudged against the appellee.

<hr>

